Eric M. Schmitz, Plaintiff-Appellant,†

v.

Firstar Bank Milwaukee, Defendant-Respondent,

Putnam Mutual Funds Corporation, Putnam Investments, Northern Trust Company, Fortis Investors, Inc., and Putnam Fiduciary Trust Company, Defendants.

Court of Appeals

*No. 01–2139. Submitted on briefs March 7, 2002.—Decided April 10, 2002.*

**2002 WI App 123**

(Also reported in 647 N.W.2d 379.)

† Petition to review granted 9-26-02.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Joseph G. Doherty* and *Eric M. Schmitz* of *Doherty Law Offices, S.C.* of West Bend.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Gary P. Lantzy* of *Kohner, Mann & Kailas, S.C.* of Milwaukee.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. NETTESHEIM, P.J. Eric M. Schmitz appeals from a summary judgment dismissing his action against Firstar Bank Milwaukee. Schmitz alleged claims of negligence and conversion against Firstar after Firstar accepted for deposit checks payable to him that he had not endorsed. The checks, paid from Schmitz's assets with Putnam,[1] a codefendant in the underlying action, were fraudulently endorsed by Schmitz's financial advisor, James O'Hearn—both with the stamp of O'Hearn's corporation, Georgetown Financial, and one with Schmitz's forged signature. Both checks were deposited in a Georgetown account and Schmitz did not receive the proceeds of this transaction.[2]

¶ 2. Schmitz argues that the circuit court erred (1) in its determination that the transaction between O'Hearn and Firstar was a valid negotiation of the check when Firstar accepted a check made payable only to Schmitz which did not contain his endorsement and deposited it in an account of a third party and (2) in its determination that the limited powers of attorney which Schmitz granted to Georgetown in 1992 were binding as to O'Hearn's fraudulent acts in 1996 and

---

[1] When speaking of "Putnam," we are referring to the defendants Putnam Mutual Funds Corporation, Putnam Investments, and Putnam Fiduciary Trust Company.

[2] James O'Hearn, who is not a party to this action, was charged and convicted of criminal fraud and is currently serving a federal prison sentence.

1998 and that those limited powers of attorney authorized Georgetown to negotiate the checks in question on Schmitz's behalf.

¶ 3. We conclude that the 1992 limited powers of attorney authorized O'Hearn to negotiate checks on Schmitz's behalf. Because this issue is dispositive, we do not reach Schmitz's additional argument as to the absence of his endorsement on the checks. *Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983). We affirm the circuit court's grant of summary judgment in favor of Firstar.

## FACTS

¶ 4. O'Hearn was the primary owner and chief executive officer of Georgetown Financial. Georgetown was an investment, insurance and financial service business engaged in providing investment advising and consultation, purchases and sales of securities and annuities, and financial and estate planning.

¶ 5. In the early 1990's, Schmitz opened investment accounts with Georgetown with O'Hearn serving as his principal contact. In July and August 1992, Schmitz executed limited powers of attorney to Georgetown for the immediate purpose of liquidating certain life insurance policies. However, both documents contained language that went beyond the authority to liquidate life insurance policies. The final sentence of the July document stated, "Power of Attorney also applies to stocks, bonds and other securities." The August document went even further, stating, "Power of Attorney also applies to stocks, bonds, CD's, annuities, savings accounts, and other securities."

¶ 6. From 1992 until 1998, O'Hearn purchased and sold various Putnam mutual funds purportedly for Schmitz's benefit and ownership. On four separate

occasions from 1996 to 1998, O'Hearn sold mutual funds from Schmitz's Putnam accounts without Schmitz's authority or direction. On each of these occasions, O'Hearn requested that Putnam issue a check in Schmitz's name to be mailed to Schmitz at Georgetown's office. The two checks at issue on appeal, in the amounts of $6173.21 and $58,599.19, were issued to "Eric M. Schmitz c/o Georgetown Financial."[3] O'Hearn deposited each of the checks into Georgetown's account at Firstar. O'Hearn endorsed the $6173.21 check issued by Putnam by forging Schmitz's name and using the Georgetown stamp. O'Hearn endorsed the $58,599.19 check issued by Putnam by using only the Georgetown stamp.

¶ 7.  On July 12, 1999, Schmitz brought this action against Firstar[4] alleging negligence based on its failure to secure proper identification from the endorser of the checks, namely O'Hearn, and its failure to ascertain the genuineness of the endorsements by failing to secure all needed endorsements on the $58,599.19 check. Schmitz alleged that Firstar knew or should have known that the endorser did not have the

[3] Unlike the checks at issue on appeal which were issued to Schmitz "c/o Georgetown Financial," the other two checks issued by Putnam were issued to both Eric M. Schmitz and Georgetown. The circuit court also granted summary judgment to Firstar with respect to these checks, but Schmitz does not challenge this ruling on appeal.

[4] Schmitz's action also joined Putnam and Northern Trust Company. Schmitz voluntarily dismissed his action against Northern Trust Company on October 11, 1999, and Putnam is not a party to this appeal. We note that Schmitz filed an amended summons and complaint on April 19, 2000, which omits Northern Trust Company and joins Fortis Investors, Inc. as a defendant.

authority to cash the Putnam checks and that the endorsements were forged. Schmitz additionally alleged conversion of funds wrongfully removed from his accounts.

¶ 8. On December 15, 2000, Schmitz filed a motion for partial summary judgment as to the $58,599.19 check, which did not contain any endorsement, forged or otherwise, by Schmitz. On December 19, 2000, Firstar filed a motion for summary judgment as to both checks arguing that the powers of attorney executed by Schmitz authorized Georgetown to endorse the Putnam checks and receive payment of the checks on Schmitz's behalf. Firstar argued that there were no genuine issues of material fact as to whether Georgetown had actual authority to endorse the checks.

¶ 9. In a memorandum decision filed April 4, 2001, the circuit court granted Firstar's motion for summary judgment as to both checks based on the limited powers of attorney granted to Georgetown by Schmitz in 1992. The court determined that the language of the powers of attorney authorized Georgetown to act on behalf of Schmitz with respect to negotiating the Putnam checks. The court found that there was no material issue of fact as to Firstar's authority to deposit the Putnam checks in Georgetown's account. Schmitz filed a motion for reconsideration on April 11, 2001, which was denied. On June 13, 2001, the court entered an order for summary judgment in favor of Firstar. Schmitz appeals.

## DISCUSSION

¶ 10. Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

WIS. STAT. § 802.08(2) (1999–2000). A summary judgment motion presents a question of law that we review de novo. *Wis. Conference Bd. of Trustees of the United Methodist Church v. Culver*, 2000 WI App 132, ¶ 25, 237 Wis. 2d 343, 614 N.W.2d 523, *aff'd*, 2001 WI 55, 243 Wis. 2d 394, 627 N.W.2d 469. Despite our de novo standard of review, we value a trial court's ruling on the matter. *Id.*

■

¶ 11. With respect to the $58,599.19 check, Schmitz first argues that the absence of any endorsement by him or on his behalf prohibited Firstar from negotiating the check. The Putnam check was issued to "Eric M. Schmitz c/o Georgetown Financial." Firstar argues that regardless of the absence of Schmitz's endorsement, the powers of attorney granted by Schmitz to Georgetown authorized Georgetown to endorse and deposit both of the Putnam checks. We agree.

■

¶ 12. Construction of a power of attorney presents a question of law that we review de novo. *Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653 (Ct. App. 1990). We accept Schmitz's argument that he executed two limited powers of attorney to Georgetown in July and August of 1992 for the immediate purpose of authorizing Georgetown to liquidate certain insurance policies. However, the final sentence of the July 1992 limited power of attorney broadened the powers granted by stating, "Power of Attorney also applies to stocks, bonds and other securities." The final sentence of the August 1992 limited power of attorney uses even broader language in providing, "Power of Attorney also applies to stocks, bonds, CD's, annuities, savings accounts, and other securities."

¶ 13. Schmitz contends that the 1992 powers of attorney were expressly "limited" to specific 1992 transactions and did not authorize the 1996 and 1998 transactions at issue on appeal. However, while the powers of attorney authorized Georgetown to liquidate life insurance policies, they also gave Georgetown limited powers of attorney with respect to stocks, bonds, CD's, annuities, savings accounts, and other securities.[5] The clear import of this language granted Georgetown the authority to act on behalf of Schmitz in the limited area of his financial affairs as pertaining to investments and accounts. O'Hearn's liquidation of Schmitz's Putman assets, albeit fraudulent, fell squarely within this grant of authority.

¶ 14. Schmitz relies on *Rountree v. Denson*, 59 Wis. 522, 527, 18 N.W. 518 (1884), in support of the application of the "universal rule" to the broad language contained in the powers of attorney. There, the court

[5] With the exception of the last sentence of the document, the July and August 1992 limited powers of attorney were identical, stating:

> I, Eric M. Schmitz, as owner of the life insurance policies identified below, do hereby designate Georgetown Financial Corporation as my attorney to act in my place, name and stead to do everything that is required, as fully as if done by me personally, to register and obtain acknowledgement of the Assignment of Life Insurance Policy form(s), and accomplish the surrender of the life insurance polic(ies) identified below and negotiation of their cash values, and including any other requested information. Answers to questions may be provided by telephone or fax (#(414) 241-3376). Power of Attorney also applies to stocks . . . .

The July 1992 limited power of attorney was signed by Schmitz and his wife, with handwritten notations as to the policy names and numbers of the insurance policies in question. The August 1992 limited power of attorney was signed by Schmitz and indicated the insurance policy in question.

stated, "The rule is universal that where 'there is a power of attorney to do a particular act followed by general words, these general words are not to be extended beyond what is necessary for doing that particular act for which the power of attorney is given.' " *Id.* at 527–28 (quoted source omitted). Schmitz's reliance on *Rountree* is misplaced.

¶ 15. The purpose of the power of attorney in *Rountree* was to give the grantee authority to accept service of process in order to procure a partition of lands, or to deed and properly convey land and "generally to do any and all things necessary to be done and performed in or about the procuring any such partition." *Id.* at 527. The supreme court held that this general catchall language did not authorize the grantee's later attempt to convey the land for his own private benefit. ("Such being the manifest object and purpose of the power of attorney, its meaning and the authority under it, was in nowise enlarged by the general expressions and words of ratification and confirmation therein contained.") *Id.* Thus, the court concluded that the grantee had exceeded the scope of the authority granted in the power of attorney. *Id.* at 528.

¶ 16. Here, the limited powers of attorney granted Georgetown authority to liquidate certain insurance policies. As in *Rountree,* in that grant of authority, Schmitz authorized Georgetown generally to "as my attorney to act in my place, name and stead to do everything that is required, as fully as if done by me personally, to register and gain acknowledgment of the Assignment of Life Insurance Policy form(s), and accomplish the surrender of the life insurance polic(ies) identified below." That general grant, "to do everything that is required," was limited to negotiations pertaining to his life insurances policies. However, unlike the power of attorney in *Rountree,* the limited powers of

attorney in this case went on to separately grant Georgetown power of attorney with respect to "stocks, bonds, CD's, annuities, savings accounts, and other securities." This additional grant of authority was not limited in scope. We reject Schmitz's contentions to the contrary.

■

¶ 17. Having rejected Schmitz's argument that O'Hearn did not have actual authority to redeem his Putnam assets, Schmitz alternatively contends O'Hearn's actual authority terminated in 1994 when O'Hearn's securities license was suspended and he began to engage in acts of disloyalty to Schmitz.[6] Schmitz cites to RESTATEMENT (SECOND) OF AGENCY (1958):

### § 111. Loss of Qualification of Principal or Agent.

The loss of or failure to acquire a qualification by the agent without which it is illegal to do an authorized act, or a similar loss or failure by the principal, of which the agent has notice, terminates the agent's authority to act if thereafter he [or she] should infer that the principal, if he [or she] knew the facts, would not consent to the further exercise of the authority.

### § 112. Disloyalty of Agent.

Unless otherwise agreed, the authority of an agent terminates if, without knowledge of the principal, he [or she] acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal.

¶ 18. Based on the RESTATEMENT, Schmitz contends that O'Hearn's actual authority to act on his

---

[6] Firstar argues that this issue is waived because Schmitz did not raise it in the circuit court. Schmitz argues otherwise. We need not resolve this conflict because we choose to address the issue on the merits and we reject Schmitz's argument.

behalf terminated when O'Hearn had reason to believe that Schmitz would no longer wish for O'Hearn to act on his behalf. While this may be true, it does not bear upon the question of Firstar's liability. The comment to § 112 addresses liability to third persons. It provides, "[i]f, after being so disloyal that his [or her] authority to act is terminated, the agent deals with a third person on account of the principal, the power of the agent to make the principal a party to the transaction is not affected . . . unless the third person has notice of the facts." *Id.* at § 112 cmt. c. Here, it is undisputed that Firstar had no knowledge of O'Hearn's illegal conduct. Nor did Firstar have any reasonable basis to suspect or know that O'Hearn was acting beyond, or without, Schmitz's authority. Therefore, regardless of whether O'Hearn's authority may have terminated, he had the ability to make Schmitz a party to the transaction with Firstar by virtue of the limited powers of attorney.[7]

## CONCLUSION

¶ 19. We conclude that the limited powers of attorney granted by Schmitz to Georgetown authorized O'Hearn to negotiate the checks in question with Firstar on Schmitz's behalf. Because Georgetown had such authority, we conclude that there is no genuine issue of material fact as to whether Firstar was negligent in depositing the checks in Georgetown's account. We affirm the circuit court's grant of summary judgment in favor of Firstar.

*By the Court.*—Judgment affirmed.

---

[7] Because we hold that O'Hearn was acting with Schmitz's actual authority, we need not address Schmitz's argument under the law of "apparent authority."